**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WILLIAM REECE; DIANE REECE;
HERMAN TOLBERT; BENNETT
TANKSLEY; SUSAN HOLMES;
CHARLES TACKETT, as individuals
and as representatives for those
seeking redress for damages,

     Plaintiffs - Appellants,

v.

AES CORPORATION, a Delaware
corporation; AES SHADY POINT,
INC., a Delaware corporation; AES
SHADY POINT, LLC, a Delaware
limited liability company; MMHF,
LLC, an Oklahoma limited liability
company, a/k/a Making Money Having
Fun, LLC, a/k/a Clean Hydro
Reclamation, a/k/a Clean Hydro
Evacuation, LLC; THUMBS UP
RANCH, LLC, an Oklahoma limited
liability company; DARYL J.
JACKSON, individually, d/b/a Daryl
Jackson Trucking; KEVIN J.
JACKSON, an individual; KENNETH
JACKSON, an individual; CHAD
JACKSON, an individual;
MOUNTAIN MINERALS, INC., a
Delaware corporation; BRAZIL
CREEK MINERALS, INC., an
Oklahoma corporation; GCI MINING,
an Oklahoma corporation, d/b/a
George Colliers, Inc.; ASH GROVE
RESOURCES, LLC, a Kansas limited
liability company;
FARRELL-COOPER MINING

No. 14-7010
(D.C. No. 6:12-CV-00457-JH)
(E.D. Okla.)

COMPANY, an Arkansas corporation; COAL CREEK MINERALS, LLC, a Delaware limited liability company; MCCORKLE TRUCK LINE, INC., an Oklahoma corporation; STAR BULK, a Texas corporation, a/k/a PX Transportation, Inc.; SEECO, INC., an Arkansas corporation, a/k/a SWN Production Company, a/k/a Southwest Energy Production Company, Inc., a/k/a Southwest Oil & Gas Company; XTO ENERGY, INC., a Delaware corporation; R&J TRUCKING, INC., an Oklahoma corporation; CHESAPEAKE OPERATING, INC., an Oklahoma corporation; PETROHAWK OPERATING COMPANY, a Texas corporation; STEPHENS PRODUCTION COMPANY, an Arkansas corporation; HIGHLAND OIL & GAS, LLC, a Delaware limited liability company; CHOLLA PETROLEUM, INC., a Texas corporation; HANNA OIL & GAS COMPANY, an Arkansas corporation; ROSS PRODUCTION COMPANY, an Arkansas corporation, a/k/a Ross Production Co., a/k/a McCord Oil Company, a/k/a Ross Explorations, Inc.; SHIELDS OPERATING, INC., an Arkansas corporation; BP AMERICA PRODUCTION COMPANY, a Delaware corporation; HOGBACK EXPLORATION, INC., an Arkansas corporation; SEDNA ENERGY, INC., an Arkansas corporation; GRACO FISHING & RENTAL TOOLS, INC., an Oklahoma corporation; TXD TRANSPORT, LP, a foreign limited partnership; BEAR PRODUCTIONS,

2

INC., an Oklahoma corporation; BIG
MAC TANK TRUCKS, LLC, a
Delaware limited liability company,
a/k/a Oklahoma Big Mac Tank Trucks,
LLC; B&B GAS WELL SERVICES,
LLC, an Oklahoma limited liability
company; MIKE KREBBS
CONSTRUCTIONS, INC., an
Oklahoma corporation; BEAR
TRANSPORTS, LLC, an Oklahoma
limited liability company,

   Defendants - Appellees,

and

BISHOP TRUCKING, an Oklahoma
corporation,

   Defendant.

---

### ORDER AND JUDGMENT[*]

---

Before **HOLMES**, **MATHESON**, and **McHUGH**, Circuit Judges.

Plaintiffs-Appellants William and Diane Reece, Herman Tolbert, Bennett

Tanksley, Susan Holmes, and Charles Tackett (collectively, "Plaintiffs") filed a

petition in the District Court for LeFlore County, Oklahoma, asserting a putative

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

class action.[1]  They alleged that several companies (collectively, "Defendants") were responsible for environmental pollution stemming from the generation and disposal of coal-combustion waste ("CCW") and fluid waste from oil and gas drilling ("produced fluid waste" or "PFW").  Defendants removed the case to the United States District Court for the Eastern District of Oklahoma under the Class Action Fairness Act ("CAFA").  Plaintiffs filed two motions to remand, and the district court denied them both.  Furthermore, after affording Plaintiffs two opportunities to cure factual deficiencies in their complaint, the district court dismissed their complaint for failure to state plausible claims for strict liability, negligence per se, and negligence.

On appeal, Plaintiffs challenge the district court's denial of their two motions for remand and also its dismissal of their amended complaint.  Because we agree with the district court's disposition of the remand motions and conclude that Plaintiffs failed to adequately allege the element of injury in their amended complaint, we **affirm** the district court's judgment.

---

[1]  In Oklahoma, the initial pleading that commences a lawsuit is called a "petition," Okla. Stat. tit. 12, § 2003; whereas, the initial pleading in federal practice is of course called a "complaint," Fed. R. Civ. P. 3.  When used herein, the terms "petition" and "complaint" refer to the same document and amendments thereto—that is, Plaintiffs' initial pleading commencing this action and any subsequent amendments thereto.

# I

## A

This case involves a putative class action alleging a variety of tort claims against several companies involved in the generation, transportation, and disposal of CCW and PFW near Bokoshe, Oklahoma.

Plaintiffs, the putative class representatives, filed their lawsuit in the District Court for LeFlore County, Oklahoma in October 2011. The petition alleged that "the transport, storage and disposal of waste materials from a coal-burning power plant and oil and gas drilling operations ha[d] resulted in millions of tons of waste material being transported and deposited in a huge pile at [a waste disposal facility] which present[ed] serious public health and environmental risks." Aplee. Supp. App. at 460–61 (Petition, dated Oct. 6, 2011). The petition included claims for strict liability, nuisance, trespass, negligence, negligence per se, and unjust enrichment against four groups:

> 1. "AES Entities": AES allegedly owns and operates the Shady Point coal-fired power plant in LeFlore County;[2]
>
> 2. "MMHF Entities": Making Money Having Fun, LLC ("MMHF") and its associated entities allegedly own and operate a commercial waste-disposal

---

[2]    The AES Entities are the following: AES Corporation, a Delaware corporation; AES Shady Point, Inc., a Delaware corporation; and AES Shady Point, LLC, a Delaware limited liability company.

facility in LeFlore County;[3]

3. "Fly Ash Truckers": these entities are allegedly involved in the transportation of CCW generated by the Shady Point plant to the MMHF waste-disposal facility;[4] and

4. "Fluid Waste Truckers": these entities are allegedly involved in the transportation of PFW generated by various oil and gas drilling operations to the MMHF facility.[5]

Approximately one year later, on October 4, 2012, Plaintiffs filed a First Amended Petition; it asserted essentially the same causes of action, but also added as defendants various "Oil Producers" who were involved in the generation

---

[3] The MMHF Entities are the following: Making Money Having Fun, LLC ("MMHF"), an Oklahoma limited liability company; Thumbs Up Ranch, LLC ("TUR"), an Oklahoma limited liability company; Daryl J. Jackson; Kevin J. Jackson; Kenneth Jackson; and Chad Jackson.

[4] The Fly Ash Truckers are the following: GCI Mining, an Oklahoma corporation; Mountain Minerals, Inc., a Delaware corporation; Brazil Creek Minerals, Inc., an Oklahoma corporation; Farrell-Cooper Mining Co., an Arkansas corporation; Ash Grove Resources, LLC, a Kansas limited liability company; Marine Coal Sales Company, a Delaware corporation; Hunter Ridge Coal Company, a Delaware corporation; International Coal Group, LLC, a Delaware limited liability company; Coal Creek Minerals, LLC, a Delaware limited liability company; McCorkle Truck Line, Inc., an Oklahoma corporation; Star Bulk, Inc., a Texas corporation; and R&J Trucking, Inc., an Oklahoma corporation.

[5] The Fluid Waste Truckers are the following: Big Mac Tank Trucks, LLC, a Delaware limited liability company; B&B Gas Well Services, LLC, an Oklahoma limited liability company; Bishop Trucking, an Oklahoma corporation; Bear Productions, Inc., an Oklahoma corporation; Graco Fishing & Rental Tools, Inc., an Oklahoma corporation; TXD Transport, LP, a foreign limited partnership; and Mike Krebbs Construction, Inc., an Oklahoma corporation.

of the PFW disposed of at the MMHF facility.[6]  In their amended petition,

Plaintiffs defined the putative class as consisting of "all citizens and/or residents

and/or property owners of the State of Oklahoma within":

a. "a three mile radius or more of" the MMHF disposal facility;[7]

b. "a three mile radius of any disposal pit or dump site located within

LeFlore County . . . into which . . . Defendants, or any one of them, have

transported, received, or disposed of Coal Waste and/or Saltwater or

Produced Fluid";

c. one thousand yards of the Town of Bokoshe or any public or private

roads, streets, and driveways that have been used by vehicles (i) hauling

---

[6]     The Oil Producers are the following: SEECO, Inc., an Arkansas corporation; XTO Energy, Inc., a Delaware corporation; Stephens Production Co., an Arkansas corporation; Chesapeake Operating, Inc., an Oklahoma corporation; Petrohawk Operating Co., a Texas corporation; Hanna Oil & Gas Co., an Arkansas corporation; Highland Oil & Gas, LLC, a Delaware limited liability company; Cholla Petroleum, Inc., a Texas corporation; BP America Production Co., a Delaware corporation; Ross Production Co., an Arkansas corporation; Shields Operating, Inc., an Arkansas corporation; Sedna Energy, Inc., an Arkansas corporation; and Hogback Exploration, Inc., an Arkansas corporation.

[7]     Despite the expansive phrasing of this criterion (e.g., "or more")—which remained throughout subsequent amendments to the class definition—the parties appear to have assumed throughout the litigation that class members qualifying on this basis must live within three miles of the disposal facility.  *See* Aplt. App. at 450, 491, 493 (map showing Class Area).  No party has ever challenged the class definition on the basis that it extends to an unlimited geographic definition of "a three-mile radius *or more*" of the MMHF facility. Because we will ultimately find that the class definition does not entitle Plaintiffs to remand for other reasons, we will assume, along with the parties, that class members who qualify based on proximity to the MMHF disposal facility must live within three miles of that facility.

CCW from the Shady Point coal-fired plant to the MMHF facility; (ii) hauling CCW from the Shady Point coal-fired plant to any other disposal pit or dump site in LeFlore County; or (iii) hauling PFW from oil and gas well drill sites to the MMHF disposal pit.

Aplt. App. at 94–95 (First Am. Petition, filed Oct. 4, 2012).

**B**

Defendants removed the case to the United States District Court for the Eastern District of Oklahoma pursuant to CAFA, 28 U.S.C. § 1332(d)(2). Plaintiffs subsequently filed a motion for remand, claiming that their case fell within the "local controversy" and "home state" exceptions articulated in 28 U.S.C. § 1332(d)(4), which require the court to refrain from exercising jurisdiction. Plaintiffs also argued that the court should decline to exercise jurisdiction under the permissive "interests of justice" exception of 28 U.S.C. § 1332(d)(3). Under all three of these exceptions, Plaintiffs were obliged to demonstrate, *inter alia*, that a certain portion of the class members are Oklahoma citizens. *See* 28 U.S.C. § 1332(d)(3) (requiring a showing under the interest of justice exception that "greater than one-third but less than two-thirds of the members of all proposed plaintiff classes" are citizens of the state where the action was filed); *id.* § 1332(d)(4)(A)(i)(I) (requiring a demonstration under the local-controversy exception that "greater than two-thirds of the members of all proposed plaintiff classes" are citizens of the forum state); *id.* § 1332(d)(4)(B)

8

(requiring under the home-state exception that "two-thirds or more of the members of all proposed plaintiff classes" be citizens of the forum state).

The court held an evidentiary hearing on the motion, but Plaintiffs did not introduce substantive evidence or witness testimony regarding citizenship of the proposed class members, instead relying on their amended petition's class definition and "summary exhibits . . . based upon data that[] [had] been collected" from various local and federal sources that purported to compare—as to the class area—the percentage of Oklahoma class members against the percentage of non-Oklahoma class members in that same area. Aplt. App. at 339–40, 369–78 (Tr. of Mot. to Remand Hr'g, dated Mar. 21, 2013). Plaintiffs did not introduce the underlying records or other data that formed the basis of the proffered charts.

The district court denied the motion for remand, finding that Plaintiffs had not met their burden of proving by a preponderance of the evidence that any of the exceptions applied. The court faulted Plaintiffs for failing to introduce any substantive evidence and instead relying on demonstrative exhibits that represented "a conclusion by counsel . . . as to what certain other public documents purportedly show" without any testimony "as to what specific records were inspected, how the calculations were made, or the like." *Id.* at 460–61 (Order, dated Apr. 2, 2013). The court also concluded that, with respect to the class definition itself, there were "simply too many variables . . . to assume" that the class met the citizenship threshold for any of the exceptions. *Id.* at 465. In

9

particular, the court noted that the class definition included Oklahoma residents and property owners—two groups that could include people who were *not* Oklahoma citizens. The court also observed that the absence of limitations on the temporal period that encompassed the proposed class complicated the citizenship calculus and interjected an additional element of uncertainty into it. Specifically, the court reasoned:

> The difficulty in assuming citizenship based on residence or property ownership becomes significantly greater here because the proposed class is not limited in time. The amended petition does not explicitly limit class membership to any particular time or period of time, and plaintiffs' counsel made clear at the hearing that plaintiffs viewed the proposed class as embracing persons who had been residents in the mid-1990's, the time when the coal-related activities began, and those impacted as early as 2003 by the disposal of produced oil and gas fluids. Inclusion in the class definition of people who lived in, or owned property in, the class area within the last twenty years injects an additional and substantial amount of uncertainty into the citizenship determination. Some portion of former residents and/or owners will have since moved and become citizens of states other than Oklahoma. Even a relatively low annual rate of such "turnover" for an area could, over twenty years, substantially impact the citizenship composition of the proposed class.

*Id.* at 464–65 (footnote omitted). Accordingly, the court concluded that Plaintiffs had not shouldered their burden concerning CAFA's exceptions and denied relief.

Over forty days after the hearing, Plaintiffs filed what they styled a "[r]enewed" motion for remand. *Id.* at 470 (Renewed Mot. to Remand, dated May 13, 2013). In this document, Plaintiffs reiterated their position that they did not need to present evidence and that their well-pleaded allegations in the amended

10

petition were sufficient to demonstrate that the case was a local controversy.[8]

Plaintiffs also provided additional evidence in the form of an affidavit from Dr.

Clifford Lipscomb, the Director of Economic Research at Greenfield Advisors,

LLC, who analyzed property records within the class area and concluded that "at

least two-thirds" of proposed class members were Oklahoma residents. *Id.* at 496

(Aff. of Clifford Lipscomb, Ph.D., dated May 13, 2013). Plaintiffs, however, did

not submit to the court the records underlying Dr. Lipscomb's analysis. In

connection with the motion, Plaintiffs also offered to amend their class definition

by limiting the class to "residents and/or property owners **that are citizens** of the

State of Oklahoma." *Id.* at 480.

The district court viewed the renewed motion for remand as "essentially

asking the court to reconsider its prior decision." *Id.* at 548 (Order, dated May

23, 2013). It concluded that Plaintiffs could not amend their complaint to divest

the court of jurisdiction after a proper removal. The court also declined to

consider the additional evidentiary support that Plaintiffs offered because it was

not presented at the hearing on the initial motion for remand. Accordingly, the

court denied the renewed motion as well. Plaintiffs sought permission from our

court to appeal from the denial of their renewed motion for remand under 28

U.S.C. § 1453(c), which allows appellate courts to consider interlocutory appeals

---

[8]     The renewed motion did not seek remand based on the home-state or interests-of-justice exceptions.

11

filed within ten days of a grant or denial of a motion for remand. Defendant XTO Energy, Inc. filed a motion to dismiss Plaintiffs' petition for permission, and a panel of this court granted it, concluding that Plaintiffs' petition was untimely.

## C

Defendants then filed individual motions to dismiss the First Amended Petition, and the district court held a hearing on these motions. The court sustained the motions to dismiss, but gave Plaintiffs fifteen days to amend. It specifically instructed that "in addition to asserting a factual basis for the various liability claims that are asserted . . . there should also be some clarification relating to . . . the injuries for which relief is sought." Aplt. App. at 698 (Tr. of Mot. Hr'g, dated Aug. 2, 2013). Plaintiffs then filed a document styled a First Amended Complaint, providing additional details regarding their claims. According to the amended complaint, AES has operated the Shady Point coal-burning power plant since 1990 and has generated CCW, a corrosive and toxic substance that can be harmful to individuals who come in contact with it. CCW is stored in concrete silos at the plant and subsequently transported off-site by truck or rail. The amended complaint averred that CCW generated at the plant escapes into the class area. In addition, the amended complaint alleged that Fly Ash Truckers hauling CCW to the disposal site release CCW when traveling on the "Haul Route"—a particular route through LaFlore County that passes close to properties owned by putative class members. *Id.* at 770 (First Amended

12

Complaint, dated Aug. 20, 2013).  The Fly Ash Truckers allegedly deposit the CCW at the MMHF facility.

In addition to CCW, the MMHF facility allegedly accepted "waste fluids and solids which are generated . . . during the course of oil and gas drilling and completion operations" conducted by the Oil Producers.  *Id.* at 787.  In this regard, MMHF allegedly accepted approximately 240 million gallons of PFW between 2003 and 2009, which it mixed with CCW in its disposal pits.  MMHF's disposal pits allegedly lie over two abandoned strip mines, and Plaintiffs alleged that the geological features of the site provide pathways for waste to migrate from the pit into the groundwater.  Nevertheless, MMHF allegedly did not place any lining in the pit to prevent waste from escaping.  Further, Plaintiffs alleged that the "toxic cocktail [of CCW and PFW] was allowed to . . . regularly overflow the pit into Doe Creek and other creeks," and, in support, referenced EPA inspections in 2009 that found MMHF had unlawfully discharged waste into the waters of the United States in violation of the Clean Water Act.  *Id.* at 796–97.  Plaintiffs also alleged that fine particulate CCW deposited at the MMHF site is carried by the winds and deposited in the class area.

The amended complaint supported these allegations by listing several instances of regulatory noncompliance where state and federal authorities found that MMHF released CCW or PFW into the air and water.  The amended complaint also alleged complicity by the other parties in MMHF's violations: it

13

noted that AES is the only source of CCW in MMHF's disposal pit, alleged that CCW is blown into the air when ash-bearing trucks unload at the pit, and asserted that MMHF's regulatory failures were a matter of public record such that the Oil Producers knew or should have known that the waste they disposed of at the facility would not be in compliance with waste-disposal regulations.

The amended complaint claimed that proposed class members live, work, and engage in various recreational activities in the class area and it generally alleged that the release of harmful waste "cause[s] injury to [their] health and their aesthetic, recreational, environmental, economic, and educational interests." *Id.* at 798. Plaintiffs averred that they are "reasonably concerned" about the health effects of the released waste and its impact on "the safety of the creeks for swimming" and the consumption of nearby fish, game, and crops. *Id.* The amended complaint also generally alleged that "Plaintiffs and Putative Class Members additionally suffer physical ailments consistent with disclosures and warnings set forth on [Material Safety Data Sheets ('MSDS')],"[9] including "respiratory conditions, . . . and skin and eye irritations" and that there "continue to be significant concentrations of cancer victims" in the area. *Id.* at 799. On the basis of these allegations, the amended complaint asserted causes of action for strict liability, negligence per se, negligence, trespass, nuisance, and unjust

---

[9] Plaintiffs averred that MSDS "disclose the hazardous and dangerous properties of CCW/Fly Ash, and provide direction in the event that persons come in contact with, ingest or inhale CCW/Fly Ash." Aplt. App. at 776.

enrichment.

**D**

Defendants individually moved for dismissal of the amended complaint under Federal Rule of Civil Procedure 12(b)(6). To begin, the district court dismissed the negligence-per se claims with prejudice against all Defendants because it found that by failing to address Defendants' argument that the "environmental statutes and regulations relied upon were intended to protect the public welfare, not support private actions," the plaintiffs "confess[ed] defendants' motions as to this issue" pursuant to Local Rule 7.1(c). *Id.* at 1514 (Order, dated Jan. 8, 2014). The court also dismissed the strict-liability claims with prejudice against all Defendants, except the MMHF Defendants, because it found that Oklahoma law does not "impose strict liability on any party that generated or transported materials to a disposal site from which the materials then escaped" and that Plaintiffs had only offered "bald assertions" that the other defendants were complicit in MMHF's allegedly improper disposal. *Id.* at 1503.

The court then dismissed all remaining claims against the Fly Ash Truckers and Fluid Waste Truckers because it concluded that the amended complaint did not allege "what they specifically did that was wrong" apart from acts solely attributable to MMHF. *Id.* at 1506–09. The court concluded that the Oil Producers had a duty to properly dispose of their waste fluids and breached this duty by "sen[ding] drilling waste to a disposal facility that was not authorized to

15

receive at least some of the fluids," *id.* at 1510; nevertheless, the court dismissed the claims against the Oil Producers because it found that the amended complaint lacked sufficiently specific allegations of harm. The amended complaint did not contain any allegation that any specific class member had come into contact with any of the fluids or suffered any specific injury, and it did not claim any loss in property values or other property damage.

The district court also dismissed all claims against the AES Defendants after it found that the element of injury was not adequately pleaded. The court found that the amended complaint did not adequately plead facts to show any connection between the AES Defendants and any injuries resulting from the transport of CCW to, or disposal of CCW at, the MMHF pit. Finally, with respect to MMHF, the court concluded that the plaintiffs had satisfied their pleading burden regarding all elements *except* for injury.

The district court did not dismiss at that time the remaining claims against MMHF, AES, or the Oil Producers, but rather gave the plaintiffs fifteen days to amend their complaint a second time to adequately allege injury. Plaintiffs did not submit any further evidence or supplement their amended complaint within the fifteen days permitted. Consequently, the district court entered judgment dismissing all remaining claims without prejudice.[10] Plaintiffs now appeal.[11]

---

[10]     In dismissing all claims against all Defendants, the district court

(continued...)

16

## II

Plaintiffs first challenge the district court's denial of their motion to remand and renewed motion to remand, and second challenge the dismissal of their claims on the merits. At the outset, we sua sponte address whether we have jurisdiction to review after final judgment the district court's denial of the motions for remand. *See, e.g.*, *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1274 (10th Cir. 2001) ("Although neither party challenges our appellate jurisdiction, we have an independent duty to examine our own jurisdiction."). Concluding that we do have jurisdiction, we affirm the district court's rejection of Plaintiffs' remand motions. Finally, we address the dismissal of all claims on the merits and affirm the district court's dismissal.

---

[10](...continued)
effectively dismissed, sua sponte, claims against R&J Trucking, Inc. and Bishop Trucking; these entities had not filed motions to dismiss. A district court has the inherent power to dismiss cases sua sponte, regardless of whether the parties move to dismiss. *See McKinney v. Okla. Dep't of Human Servs.*, 925 F.2d 363, 365 (10th Cir. 1991); 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004) ("Even if a party does not make a formal motion under Rule 12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties."). In any event, the district court's action as to these two companies is not challenged here.

[11]      Three of the companies that are Defendants-Appellees—Marine Coal Sales Company, Hunter Ridge Coal Company, and International Coal Company, Inc.—filed for bankruptcy on January 11, 2016, after briefing and oral argument had concluded in this appeal. In response, on January 15, 2016, our court entered an order abating this appeal only as it pertains to these three debtor Defendants. Consequently, our disposition here does not directly relate to them and is not binding on them.

17

## A

Based upon the colloquy between the court and counsel at oral argument, we take notice of a colorable question regarding whether we have jurisdiction to review the district court's denial of Plaintiffs' remand motions as part of our review of the court's final judgment. By statute, "a court of appeals *may* accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not more than 10 days after entry of the order." 28 U.S.C. § 1453(c)(1) (emphasis added). The question before us is whether § 1453 provides an exclusive ten-day window for the appeal of such orders or whether it merely provides an optional one, such that a litigant may subsequently appeal from the court's order to deny remand in the ordinary course of things after entry of final judgment.

More specifically, is the statutory ten-day window for an interlocutory appeal from an order denying a motion to remand a class action the only way that a court of appeals may consider the denial, or is it just one optional way? If it is the former, then we lack jurisdiction to address the denial of Plaintiffs' remand motions because their appeal is outside of the ten-day window. But if it is the latter, then we may review the district court's denial of the remand motions as part of our review of the court's final judgment; Plaintiffs timely appealed from that judgment pursuant to 28 U.S.C. § 1291. Because we conclude that § 1453

18

creates an optional window to appeal from the denial of a motion to remand, we conclude that we have jurisdiction to review the district court's denial of Plaintiffs' remand motions.[12]

At first blush, our decision in *Weber v. Mobil Oil Corp.*, 506 F.3d 1311 (10th Cir. 2007), could conceivably be read to indicate that we lack jurisdiction over Plaintiffs' post-judgment appeal from the court's denial of their remand motions. *Weber* involved a class action that was filed in 2001 and then removed to federal court after CAFA was enacted in 2005. *Id.* at 1313. The plaintiffs there submitted a motion in the district court to remand the case to Oklahoma state court on the basis that CAFA did not apply because the action was commenced prior to its enactment. *Id.* The district court agreed and remanded the case to state court. *Id.*

Our court accepted the appeal from that ruling under 28 U.S.C. § 1453(c)(1). *Id.* We observed that "[g]enerally, an order remanding a case to the state court from which it originated is not reviewable on appeal." *Id.* (citing 28 U.S.C. § 1447(d)). But we noted that jurisdiction was founded on

---

[12]    Recall that Plaintiffs did seek permission to appeal from the district court's denial of their second motion to remand, pursuant to 28 U.S.C. § 1453(c), but a panel of our court deemed that petition for permission to be untimely. The issue now is whether we have jurisdiction following entry of final judgment to review the court's denial of this motion and the first one under 28 U.S.C. § 1291.

§ 1453(c)(1)'s limited exception. Reviewing *Weber*'s reasoning, one might conceivably be tempted to reach the conclusion that § 1453—with its ten-day window to appeal—provided the only means for us to consider the district court's denial of Plaintiffs' motions for remand, and that ten-day window has long since expired. However, there is an important distinction between *Weber* and this case. *Weber* involved the district court's *grant* of a motion to remand, while this case involves the district court's *denial* of a motion to remand. This is a distinction with a major difference; indeed, it is dispositive.

An order granting remand to the state court from which a case was removed "is not reviewable on appeal or otherwise," unless it is a suit against a federal agency or official under 28 U.S.C. § 1442, or a civil rights suit under 28 U.S.C. § 1443. 28 U.S.C. § 1447(d). But § 1447(d) only addresses an order granting remand, *not* an order denying remand. In contrast, "notwithstanding section 1447(d)," § 1453 provides a window of appeal from both orders granting remand and orders denying remand.[13] In other words, in the absence of § 1453, we would be specifically prohibited by § 1447(d) from considering appeals from orders granting remand motions, but not from considering appeals relative to orders

---

[13] For ease of reference, we note again that, under § 1453, "notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not more than 10 days after entry of the order." 28 U.S.C. § 1453(c)(1).

20

denying remand motions. That is why, as *Weber* implies, all appeals from orders *granting* remand motions must come within the ten-day window of § 1453.

However, there is no provision comparable to § 1447(d) that (absent exceptions) bars appeals from orders denying motions to remand. Consequently, quite apart from the interlocutory avenue to appeal from such orders that § 1453 provides, we may also take jurisdiction over appeals relative to the denial of a motion to remand after entry of final judgment pursuant to 28 U.S.C. § 1291. Put another way, we do not depend on § 1453 as the only avenue to hear an appeal from a *denial* of a motion to remand, as opposed to the *grant* of a such a motion. Though § 1453 establishes an interlocutory route to appeal, it in no way diminishes our power to hear a challenge to a denial of a motion to remand as part of our ordinary review of a district court's final judgment under 28 U.S.C. § 1291. In sum, a district court's denial of a motion to remand is reviewable in an appellate court after entry of final judgment, even if no interlocutory appeal from the denial was filed.

Other circuit courts, and panels thereof, have identified no jurisdictional defect in the review after final judgment of denials of motions to remand in CAFA cases. *See Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352 (6th Cir. 2015) (reviewing a district court's denial of a motion to remand after entry of final judgment, where the court conducted further proceeding after the denial and dismissed the case on the merits); *Brown v. Mortg. Elec. Registration Sys., Inc.*,

21

738 F.3d 926, 930–34 (8th Cir. 2013) (reviewing orders twice denying remand motions as part of review of the final judgment); *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 789–90 (8th Cir. 2012) (reviewing order denying motion to remand in district court as part of review of final judgment of a CAFA action); *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058 (11th Cir. 2010) (same); *see also Hoffman v. Nutraceutical Corp.*, 563 F. App'x 183, 184–85 & n.2 (3d Cir. 2014) (reviewing order denying a motion to remand in a CAFA case outside of the ten-day window as part of the review of the final judgment, and explaining that the court has jurisdiction under 28 U.S.C. § 1291 because "[a] denial of a motion to remand is properly reviewable on appeal from a final judgment" (quoting *Albright v. R.J. Reynolds Tobacco Co.*, 531 F.2d 132, 134 (3d Cir. 1976))); *Lemy v. Direct Gen. Fin. Co.*, 559 F. App'x 796, 798 (11th Cir. 2014) (per curiam) (reviewing order denying motion to remand in district court as part of review of final judgment of a CAFA action); *Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x 622, 624–26 (2d Cir. 2012) (same).

And although we have not previously considered our post-judgment appellate jurisdiction to review orders denying motions to remand in the CAFA context, we have regularly exercised jurisdiction over such orders post-judgment in other contexts. *See Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1247 (10th Cir. 2004) ("This court has jurisdiction over a denial of a motion to remand to state court when coupled with the appeal of a final judgment." (quoting

22

*Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1076 (10th Cir. 1999)));

*Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1288–89 (10th Cir. 2001)

(taking jurisdiction to address the district court's denial of a motion to remand

when appealing the court's final judgment), *abrogated on other grounds by Dart*

*Cherokee Basin Operating Co. v. Owens*, --- U.S. ----, 135 S. Ct. 547 (2014);

*accord Bailey v. Janssen Pharmaceutica, Inc.*, 536 F.3d 1202, 1204 (11th Cir.

2008) ("We have jurisdiction to consider denial of a motion to remand upon the

entry of a final order . . . ."); *Fakouri v. Pizza Hut of Am., Inc.*, 824 F.2d 470, 472

(6th Cir. 1987) ("An appellate court has jurisdiction to consider the denial of a

motion to remand a case to state court when coupled with an appeal of a final

judgment.").

Moreover, we note that the Supreme Court, in *Caterpillar Inc. v. Lewis*,

519 U.S. 61 (1996), ruled that an appellate court could consider post-judgment a

district court's order denying a motion to remand in a diversity-jurisdiction case,

despite the availability of an interlocutory appeal from such a denial under 28

U.S.C. § 1292(b).  In *Caterpillar*, the Supreme Court considered, *inter alia*,

whether an appellate court could properly consider a district court's order denying

a motion to remand a case to state court, and what the proper remedy was for the

erroneous denial after the parties fully litigated the case, including a six-day trial.

*Id.* at 67.  The Supreme Court found that "by timely moving for remand, [the

plaintiff] did all that was required to preserve his objection to removal" for

23

appellate review. *Id.* at 74. And the Court held that a party was not required to attempt an interlocutory appeal when its motion to remand is denied. *Id.* ("Nor is a plaintiff required to seek permission to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) in order to avoid waiving whatever ultimate appeal right he may have." (footnote omitted)). Instead, the Court found that the appellate court could properly consider after final judgment whether the order denying the motion to remand was proper. *Id.*

Of course, in *Caterpillar*, the Supreme Court was interpreting 28 U.S.C. § 1292(b), rather than 28 U.S.C. § 1453. Nevertheless, we view its reasoning as persuasive, given the similarities between § 1292(b) and § 1453. Notably, § 1292(b) states that we "may . . . , in [our] discretion, permit an appeal to be taken from" an interlocutory order. Similarly, § 1453(c)(1) states that we "may accept an appeal from an order of a district court granting or denying a motion to remand a class action." Both statutes use permissive language (i.e., "may") and other circuits have recognized that "in enacting § 1453(c)(1) Congress intended to mirror the procedures for taking an appeal pursuant to [28 U.S.C.] § 1292(b)." *Patterson v. Dean Morris, L.L.P.*, 444 F.3d 365, 369 (5th Cir. 2006) (quoting *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*, 435 F.3d 1140, 1145 (9th Cir. 2006)). This suggests to us that an appellant does enough to preserve its right to appeal post-judgment from an order denying remand by moving for the remand—irrespective of whether the party could have

24

sought an interlocutory appeal under § 1292(b) or § 1453(c)(1).

Accordingly, considering the matter sua sponte, we conclude that we have jurisdiction under 28 U.S.C. § 1291 to consider the district court's orders denying Plaintiffs' remand motions following entry of final judgment.

**B**

Exercising our jurisdiction to review the district court's orders denying remand, we uphold its decisions. "We review the district court's ruling on the propriety of removal de novo." *Parson v. Johnson & Johnson*, 749 F.3d 879, 886 (10th Cir. 2014) (quoting *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012)) (reviewing a district court's grant of a motion for remand). We address the court's orders with respect to both Plaintiffs' initial motion for remand and their second motion for remand, and conclude that it properly denied them.

**1**

Under CAFA, a federal district court has subject matter jurisdiction "over class actions involving [1] at least 100 members and [2] over $5 million in controversy when [3] minimal diversity is met (between at least one defendant and one plaintiff-class member)." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009) (per curiam); *see* 28 U.S.C. § 1332(a). The parties agree that these three conditions are satisfied. Nevertheless, CAFA contains certain mandatory jurisdictional exceptions; where the requirements of

25

those exceptions are met, the district court must eschew jurisdiction and remand the case. Notably, Plaintiffs argue that one such exception applies here—the local-controversy exception, 28 U.S.C. § 1332(d)(4)(A).[14]

The local-controversy exception requires plaintiffs seeking remand to show that "greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed"—here, Oklahoma. *See* 28 U.S.C. § 1332(d)(4)(A)(i)(I); *see, e.g.*, *Coffey*, 581 F.3d at 1243 (describing the citizenship requirement as one of the "three main requirements for plaintiffs to meet in order to satisfy the 'local controversy exception'"). Rather than divesting a court of jurisdiction, the local-controversy exception "operates as an abstention doctrine." *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 636 F.3d 971, 973 (8th Cir. 2011). The local-controversy provision is "a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole" and "all doubts [are] resolved 'in favor of exercising jurisdiction over the case.'" *Evans v.*

---

[14] In the district court, Plaintiffs also argued that the district court lacked jurisdiction under the home-state exception to CAFA, 28 U.S.C. § 1332(d)(4)(B), and that the district court should have declined to exercise jurisdiction under the discretionary interests-of-justice exception, 28 U.S.C. § 1332(d)(3). Because Plaintiffs have only argued on appeal that jurisdiction was improper under the local-controversy exception, we deem any remand arguments under the other exceptions to be abandoned and thus waived. *See, e.g.*, *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1116 n.21 (10th Cir. 2005) ("Failure to raise an issue in an opening appellate brief waives the issue.").

26

*Walter Indus., Inc.*, 449 F.3d 1159, 1163 (11th Cir. 2006) (quoting S. Rep. No. 109-14, at 42 (2005)); *see also Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1262 (10th Cir. 2014) ("[CAFA]'s provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." (quoting S. Rep. No. 109-14, at 43 (2005))).

**2**

Plaintiffs defined the class as consisting of all "'citizens and/or residents and/or property owners' whose injuries occurred within LeFlore County." Aplt. App. at 116 (Mot. to Remand, dated Dec. 5, 2012) (quoting Aplt. App. at 94). In denying the first remand motion, the district court found that Plaintiffs' inclusion of residents and property owners in the class created considerable uncertainty regarding the satisfaction of the citizenship criterion, and reasoned that "[t]he difficulty in assuming citizenship based on residence or property ownership becomes significantly greater here because the proposed class is not limited in time," but rather embraces "people who lived in, or owned property in, the class area within the last twenty years." *Id.* at 464. The court was unwilling to resolve the citizenship question relative to, *inter alia*, the local-controversy exception in Plaintiffs' favor based on conjecture or speculation. *See id.* Thus, in the absence of any substantive evidence, the court concluded that it was not required to decline jurisdiction pursuant to § 1332(d)(4)(A). *Id.* at 465–66.

27

**a**

Plaintiffs argue that the district court erred in denying their initial motion for remand: specifically, they maintain that based on the averments of their amended petition and the materials they submitted at the hearing, the district court could have determined that the citizenship criterion for the local-controversy exception was satisfied. We disagree.

**i**

It cannot be disputed that Plaintiffs here bear the burden of establishing the applicability of the local-controversy exception. *See, e.g.*, *Woods*, 771 F.3d at 1262 (noting that "a party seeking remand to the state court bears the burden of showing jurisdiction in federal court is improper under one of CAFA's exclusionary provisions"); *see also Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1019 (9th Cir. 2007) ("The structure of the statute and the long-standing rule on proof of exceptions to removal dictate that the party seeking remand bears the burden of proof as to any exception under CAFA."). Several of our sister circuits have required plaintiffs to establish the elements of a CAFA jurisdictional exception by a preponderance of the evidence. *See, e.g.*, *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 884 (9th Cir. 2013); *Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497, 503 (3d Cir. 2013); *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 570 (5th Cir. 2011); *In re Sprint Nextel Corp.*, 593 F.3d 669, 673 (7th Cir. 2010). Some district courts, however, have required less proof,

28

embracing a reasonable-probability standard or something akin to it. *See, e.g.*, *Dunham v. Coffeyville Res., LLC*, No. 07–1186–JTM, 2007 WL 3283774, at *3 (D. Kan. Nov. 6, 2007) (requiring a "reasonable probability" that the citizenship threshold is satisfied); *Fiore v. First Am. Title Ins. Co.*, No. 05–CV–474–DRH, 2005 WL 3434074, at *2 (S.D. Ill. Dec. 13, 2005) (same); *see also Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 80 (S.D.N.Y. 2006) (asking whether it was "reasonably likely" that two-thirds of class members were citizens of the forum state). Under either approach, "the movant must make some minimal showing of the citizenship of the proposed class at the time that suit was filed." *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 802 (5th Cir. 2007).

"A pure inference regarding the citizenship of prospective class members may be sufficient if the class is defined as limited to citizens of the state in question." *Mondragon*, 736 F.3d at 881–82; *see also Coffey*, 581 F.3d at 1243 (considering a putative class limited to Oklahoma citizens). However, Plaintiffs' class here was not restricted to citizens; instead, it included "citizens and/or residents and/or property owners." *See* Aplt. App. at 116 (quoting Aplt. App. at 94). This definition encompasses groups who may not necessarily be Oklahoma citizens. "[A] person is a citizen of a state if the person is domiciled in that state." *Middleton v. Stephenson*, 749 F.3d 1197, 1200 (10th Cir. 2014). "[A] person acquires domicile in a state when the person resides there *and* intends to

29

remain there indefinitely," which is established by the "totality of the circumstances." *Id.* at 1200–01 (emphasis added).

To be sure, "the place of residence is *prima facie* the domicile." *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994). But "allegations of mere 'residence' may not be equated with 'citizenship.'" *Whitelock v. Leatherman*, 460 F.2d 507, 514 (10th Cir. 1972); *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("'Domicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another." (citation omitted)); *Preston*, 485 F.3d at 798 ("A party's residence in a state alone does not establish domicile. Domicile requires residence in the state *and* an intent to remain in the state." (emphasis added) (citation omitted)); *Meyerson v. Harrah's E. Chi. Casino*, 299 F.3d 616, 617 (7th Cir. 2002) ("[The plaintiff's] complaint alleged that he 'resides in the State of Michigan,' but residence and citizenship are not synonyms and it is the latter that matters for purposes of the diversity jurisdiction."); *cf. Sprint Nextel*, 593 F.3d at 674 ("[A] court may not draw conclusions about the citizenship of class members based on things like their phone numbers and mailing addresses."). And it is even more obvious that mere property ownership in a state does not necessarily equate to citizenship in that state; a person may own property in a state without either being a state resident or intending to remain there. *See, e.g.*, *Evans*, 449 F.3d at 1165–66 (concluding that a class defined to include "property owners, lessees,

30

[and] licensees of properties" who came in contact with defendants' waste substances was not necessarily limited to Alabama citizens); *see also Gerstenecker v. Terminix Int'l, Inc.*, No. 07-CV-0164-MJR, 2007 WL 2746847 at *2 (S.D. Ill. Sept. 19, 2007) (ruling that a class composed of property owners in Illinois did not qualify for remand because owners of real property are not necessarily residents, and residents are not necessarily citizens).

Because Plaintiffs did not include in their amended petition an unambiguous limitation confining the class definition to Oklahoma citizens, they were obliged to do more: they, perforce, had to marshal and present some persuasive substantive evidence (extrinsic to the amended petition) to establish the Oklahoma citizenship of the class members. *See, e.g.*, *Lafalier v. Cinnabar Serv. Co.*, No. 10–CV–0005–CVE–TLW, 2010 WL 1486900, at *5 (N.D. Okla. Apr. 13, 2010) ("Mere allegations that plaintiffs are citizens of Oklahoma will not suffice, and plaintiffs must come forward with some evidence establishing their citizenship."). Indeed, courts have required evidentiary proof even for "propositions that appear likely on their face." *Mondragon*, 736 F.3d at 884.

To this point, the Seventh Circuit's decision in *Sprint Nextel* is both apposite and persuasive. In *Sprint Nextel*, the plaintiffs defined a class limited to "those who (1) had a Kansas cell phone number, (2) received their cell phone bill at a Kansas mailing address, and (3) paid a Kansas 'USF fee,' which is applied to all long-distance calls within Kansas." 593 F.3d at 671. The district court

31

granted the plaintiffs' motion for remand on the grounds that the home-state exception was applicable, but the Seventh Circuit reversed because it could not conclude from the class definition averred in the state court complaint that two-thirds of the proposed plaintiff class were Kansas citizens. *Id.* at 673–76. The court did consider it likely that the vast majority of the proposed class members were Kansas residents because "[p]eople with Kansas cell phones presumably have them because they lived or worked in the state at some time, and the current Kansas mailing addresses suggest that they still do." *Id.* at 673. The court also thought it likely that few of these residents were nondomiciliaries (i.e., non-citizens). *Id.* at 673–74. But the court dismissed such "[s]ensible" inferences as "guesswork," and was unwilling to presume that more than two-thirds of the class were domiciled in Kansas based on this chain of inferences. *Id.* at 674–75. In the absence of evidence that confirmed that two-thirds of the class members were indeed Kansas citizens, or a class definition that restricted class members to Kansas citizens, the court was unwilling to assume that the class definition met the citizen requirement, even if the assumption had an "intuitive appeal." *Id.* at 675–76 (quoting *Phillips v. Severn Trent Envtl. Servs., Inc.*, No 07-3889, 2007 WL 2757131 at *3 (E.D. La. Sept. 19, 2007)). Here, Plaintiffs called upon the district court to engage in similar guesswork; it properly declined to do so.

In sum, the district court here did not err in insisting that Plaintiffs demonstrate, through more than their broad pleading averments, that over two-

32

thirds of the proposed class were Oklahoma citizens.  And Plaintiffs did not rise to meet the court's demand.

<b>ii</b>

In this regard, the district court correctly determined that Plaintiffs' summary exhibits were inadequate.  To begin with, Plaintiffs did not validate the conclusions contained in the summary exhibits by, for example, presenting to the court the records upon which the exhibits were ostensibly based or offering sworn testimony regarding the analysis underlying the conclusions.  The court was well within its discretion under these circumstances to decline to accept as evidence the summary exhibit stating that ninety-two percent of property owners "are known to reside . . . within the class area," Aplt. App. at 372.  *See* Fed. R. Evid. 1006 (requiring the proponent of a summary or chart to make the originals of records summarized therein available for examination or copying); *United States v. Lewis*, 594 F.3d 1270, 1282 (10th Cir. 2010) (discussing the requirement that a party offering a summary must make the underlying records available to permit the accuracy of the summary to be independently checked); *see also United States v. Anderson*, 105 F.3d 670 at *2 (10th Cir. Dec. 27, 1996) (unpublished table decision) ("Prior to the introduction of a summary exhibit, the party offering the exhibit must lay a proper foundation for the admission of the original materials upon which the exhibit is based and make those originals available to the opposing party for review.").

Even if the district court had accepted the summary exhibits as substantive evidence—that is, as proof of the conclusions contained therein—the exhibits would not have provided the district court with a sound legal basis to rule in Plaintiffs' favor on the local-controversy question. As the district court noted, stripped to their "essence," the exhibits ostensibly demonstrated that "8% of owners of record have addresses outside of Oklahoma." Aplt. App. at 461. That is, they purported to show that over two-thirds (i.e., ninety-two percent) of property owners in the class area actually resided in that area. However, even if this were true, as we have seen, this fact would not have been determinative, because residence does not necessarily equate with citizenship. In other words, the fact that more than two-thirds of property owners were residents did not mean that more than two-thirds of property owners were citizens.

Moreover, even if the district court could have assumed that the current property owners are residents and citizens, that would not have ended the inquiry because, as the district court noted, the proposed class was not temporally limited to the current period. It extended back in time at least twenty years. And, for those past periods, Plaintiffs' exhibits were silent: that is, they did not reveal what percentage of property owners resided in the class area—and thus were ostensible citizens—say, ten, fifteen, or twenty years ago. Of course if there could be some assurance that the current property owners were substantially the same as the property owners of the past, one might be able to reasonably infer

34

that the current property-owner/residence percentages were at least roughly the same as those of the past. However, on this record, the district court could not have gained such assurance.

As the district court observed, "Some portion of former residents and/or owners will have since moved and become citizens of states other than Oklahoma. Even a relatively low annual rate of such 'turnover' for an area could, over twenty years, substantially impact the citizenship composition of the proposed class." *Id.* at 464–65. The ill-defined temporal limits of Plaintiffs' proposed class, in the district court's words, "interject[ed] an additional and substantial amount of uncertainty into the citizenship determination." *Id.* at 464. In our view, the district court would have been engaging in sheer speculation on this record to infer past property-owner/residence percentages from current ones, and the court wisely declined to consider the exhibits and embark on such speculation. Consequently, the summary exhibits would not have meaningfully assisted the court in determining what percentage of the total proposed class—viewed in the aggregate and spanning at least twenty years—were Oklahoma residents, much less citizens.

In sum, the district court did not err in declining to treat Plaintiffs' summary exhibits as substantive evidence. Moreover, they would not have availed Plaintiffs in any event. Plaintiffs were not entitled to relief.

35

The cases that Plaintiffs cite in support of an obverse conclusion are unavailing. For example, Plaintiffs argue that our decision in *Dyer* supports their position that residence is sufficient to demonstrate domicile in the absence of a contrary showing. In *Dyer*, a defendant could not be located and a codefendant argued that there was not complete diversity because the plaintiff was domiciled in Illinois and the missing defendant could, theoretically, be domiciled anywhere, including Illinois. *Dyer*, 19 F.3d at 518. We concluded that the district court's rejection of the codefendant's argument was not clearly erroneous after the plaintiff showed that the missing defendant's last known domicile was in Oregon; he had an Oregon driver's license and had been in Wyoming when the accident occurred; and the missing defendant had been a resident of Wyoming "[a]t all times material to this Complaint." *Id.* at 518–19.

*Dyer*, however, is distinguishable and offers little guidance on these facts. *Dyer* did not involve an inquiry into the place of citizenship of the missing defendant, much less that of a class of persons, as here; rather, *Dyer*'s probe was focused on whether Illinois could be negated as a place of citizenship, that is, at the very least could the court properly say that the missing defendant was *not* a citizen of Illinois. Evidence that is sufficient to prove that a defendant is *not* a citizen of a given state is not necessarily sufficient to affirmatively prove that he is a citizen of a particular state. Indeed, in *Dyer*, neither the district court nor our

court definitively determined in which state the defendant was domiciled (i.e., could be deemed a citizen), despite evidence of his residence. *Id.* Moreover, we cautioned there that "[r]esidence alone is not the equivalent of citizenship." *Id.* at 520. And Plaintiffs' analysis repeatedly elides this important legal proposition. Accordingly, we think Plaintiffs' reliance on *Dyer* is misplaced.

Plaintiffs' authority, therefore, does not give us pause or alter our conclusion. To briefly recap, the party moving for remand under the local-controversy exception bears the burden of demonstrating that more than two-thirds of its proposed class members are citizens of the state from whose courts the case was removed. A demonstration that the proposed class members are property owners or residents of that state will not suffice in the absence of further evidence demonstrating citizenship. Because Plaintiffs' proposed class included citizens, residents, and property owners, and they did not introduce evidence sufficient to show that the residents and property owners were also citizens, Plaintiffs did not meet their burden. Accordingly, the district court properly denied the first motion to remand.

**b**

We also discern no error in the district court's denial of Plaintiffs' self-styled "renewed" motion for remand. The parties dispute whether this motion should be treated as a free-standing, new motion for remand (Plaintiffs' view) or as a motion to reconsider the previous denial of the first motion for remand

37

(Defendants' view). We would review the former motion de novo, *Parson*, 749 F.3d at 886, and the latter for abuse of discretion, *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013). We need not resolve this dispute, however. Even proceeding on the assumption that the motion was a new one that we review under the more searching de novo standard, we conclude that Plaintiffs' motion did not satisfy the standards for remand under the local-controversy exception.[15]

Plaintiffs' second motion reiterated their position that they did not need to present evidence and that the well-pleaded allegations in the amended petition were sufficient to show that the case was a local controversy. As we have demonstrated above, however, the amended petition's averments were actually inadequate to show that over two-thirds of the proposed class were *citizens* of Oklahoma, as opposed to merely Oklahoma residents or property owners.

Ostensibly to address the district court's concern about the factual holes in its presentation, in its renewed motion, Plaintiffs did present substantive evidence in the form of an affidavit from Dr. Clifford Lipscomb, the Director of Economic Research at Greenfield Advisors, LLC. Dr. Lipscomb was asked to determine (1) whether "two-thirds or more of the putative class plaintiffs in the proposed class area (as of 2009) [were] still residents of the State of Oklahoma as of 2012"; and

---

[15] The renewed motion did not seek remand based on the home-state or interests-of-justice exceptions.

(2) whether "two-thirds or more of the residents in the proposed class area (as of 1998) [were] still residents of the State of Oklahoma as of 2012." Aplt. App. at 490 (Lipscomb Affidavit, dated May 13, 2013). Though they were not supplied to the district court, Dr. Lipscomb purported to rely on a variety of records and other data sources, including "publically available data from the U.S. Census Bureau for Le Flore County," "data from the proposed class area related to sales transactions between 2009 and 2012," and "geographic information system (GIS) data, which includes the physical address of properties in the proposed class area." *Id.* at 492, 494. He averred that these sources helped him to reach conclusions, *inter alia*, about "the rate of migration of the proposed class plaintiffs at two different time periods (late 1990s and from 2009–2012)" and about "the percentage of properties that had an ownership change between 2009 and 2012." *Id.* Dr. Lipscomb's ultimate conclusion was that "the class area is comprised of *at least* two-thirds Oklahoma *residents*" and that "[t]he outmigration of residents in the proposed class area does not occur in sufficient numbers to have an appreciable impact on [his] conclusion." *Id.* at 496 (emphases added).

The district court refused to consider Dr. Lipscomb's affidavit because it could have been presented at the hearing on the first motion; prior to that hearing, the court had admonished the plaintiffs "if there is some additional evidence you feel a need to offer this is the hearing to do it at, not a post-hearing submission." Aplt. App. at 407. Whether the court erred in failing to consider this additional

39

evidence turns in part on whether the renewed motion is properly viewed as a motion for reconsideration. Certainly, if it was such a motion, the court would have had considerable discretion to decline to entertain this evidence—which could have been presented at the first hearing. *See Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (discerning no abuse of discretion where the district court declined to consider two affidavits submitted with a motion to reconsider that should have been presented in prior briefing); *Price v. Philpot*, 420 F.3d 1158, 1167–68 (10th Cir. 2005) (holding that the district court did not abuse its discretion in declining to consider a belatedly filed affidavit submitted as an attachment to a motion to reconsider). However, as noted, we need not dwell here on the proper characterization of this motion. We are content to assume that it was not one for reconsideration. Even under this view, we conclude that if the district court erred in not considering Dr. Lipscomb's affidavit, such error was harmless. We are confident that the affidavit would not have altered the outcome—*viz.*, the district court properly denied the second motion for remand.

Though Defendants do not argue the point, we note at the outset that the ultimate conclusion of Dr. Lipscomb's affidavit falls numerically short of the statutory standard for the local-controversy exception and, thus, could never be sufficient evidence, standing alone, to establish the exception's applicability. Specifically, unlike the home-state exception (i.e., "two-thirds or more"), 28

40

U.S.C. § 1332(d)(4)(B), the numerical showing under the local-controversy exception is "greater than two-thirds," *id.* § 1332(d)(4)(a)(i)(I).  Yet, Dr. Lipscomb's ultimate conclusion was framed in terms less than that, specifically, "at least two-thirds," though he was explicitly authorized to comment on whether "more" than two-thirds were present.  Aplt. App. at 490, 496.  In other words, even if we could construe Dr. Lipscomb's conclusion as directly implicating citizenship rather than residency (which, as noted below, we cannot), it would not definitively tell us whether "greater than two-thirds" of the proposed class are Oklahoma citizens; it would only tell us that "two-thirds" of them are.  And that is numerically inadequate under the local-controversy exception.

Be that as it may, Dr. Lipscomb's affidavit fails to cure a fundamental defect of Plaintiffs' first try at establishing the applicability of the local-controversy exception because it is framed in terms of residency, not citizenship. In other words, Dr. Lipscomb's affidavit only opines that "the class area is comprised of at least two-thirds Oklahoma *residents*," *id.* at 496 (emphasis added); it is silent regarding how many of those residents are actually Oklahoma citizens.  Yet, as we have seen, proof of residency is not enough: the standard for remand under the local-controversy exception is that more than two-thirds of class members are *citizens*, and citizenship requires both residency *and* intent to remain indefinitely.  Because Dr. Lipscomb's affidavit (i.e., Plaintiffs' evidence) does not speak to the intent-to-remain component, it was ineffective in demonstrating

41

that two-thirds of the proposed class were Oklahoma citizens.

In contemplating Plaintiffs' failure of proof, we are reminded of the Eleventh Circuit's observations in *Evans*, where the court discounted the probative value of the expert of the plaintiff class:

> [P]laintiffs have not carried their burden of demonstrating that more than two-thirds of the plaintiff class are Alabama citizens. We understand that evidence of class citizenship might be difficult to produce in this case. That difficulty, however, is to a considerable degree a function of the composition of the class designed by plaintiffs. The local controversy exception is designed to ensure that state courts hear cases of a truly local nature. We have no way of knowing what percentage of the plaintiff class are Alabama citizens. We conclude that the evidence adduced by the plaintiffs wholly fails to present a credible estimate of the percentage of the plaintiff class who are citizens of Alabama. Accordingly, we hold that Plaintiffs have failed to prove that more than two-thirds of the plaintiff class are Alabama citizens.

449 F.3d at 1166; *see Preston*, 485 F.3d at 803–04 ("[T]he key feature of any judicial inquiry under this CAFA exception must focus on the two-thirds fraction . . . . The medical records only provide the court with residency information for the proposed class and fail to demonstrate their intent to be domiciled in New Orleans."); *see also Mondragon*, 736 F.3d at 884 ("That a purchaser may have a residential address in California does not mean that person is a citizen of California. In addition, the proposed class reaches back to cover purchases made as long as four years before the filing of the complaint . . . . There is simply no evidence in the record to support a finding that the group of citizens outnumbers

42

the group of non-citizens by more than two to one."). The words of *Evans* and like cases resonate here.

Plaintiffs remind us, however, that they offered—albeit only after the court had denied the first motion for remand—to modify the class definition to limit the class to "residents and/or property owners **that are citizens** of the State of Oklahoma." Aplt. App. at 480. Although this class definition might have been effective if employed when the case was first filed, post-removal amendments are ineffective to divest a federal court of jurisdiction. *See Salzer v. SSM Health Care of Okla., Inc.*, 762 F.3d 1130, 1133 (10th Cir. 2014) ("[T]he propriety of removal is judged on the complaint as it stands at the time of the removal . . . ." (quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1488 (10th Cir. 1991))); *see also In re Burlington N. Santa Fe Ry. Co.,* 606 F.3d 379, 380–81 (7th Cir. 2010) (noting that the "general rule" in a case removed under CAFA is that "nothing filed after a notice of removal affects jurisdiction"; therefore, a plaintiff may not require remand to state court by amending its complaint to eliminate class allegations); *cf. Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 n.6 (2007) ("[W]hen a defendant removes a case to federal court based on the presence of a federal claim, an amendment eliminating the original basis for federal jurisdiction generally does not defeat jurisdiction."). Accordingly, the district court properly decided to decline Plaintiffs' amendment proposal.

In sum, we uphold the district court's denial of Plaintiffs' "renewed"

43

motion for remand.  Therefore, having properly denied remand twice, the district court correctly took jurisdiction and reached the merits of this case.  We turn now to Plaintiffs' challenges to the court's merits rulings.

## C

Regarding the adequacy of Plaintiffs' amended complaint, we conclude that it fails to state a plausible claim for strict liability, negligence, and negligence per se because it does not contain adequate factual allegations that Plaintiffs have been injured by Defendants' alleged wrongdoing.

We review de novo the district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).  In doing so, "[w]e accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Id.*  The complaint must contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); that is, it must "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  We have clarified that the *Twombly/Iqbal* standard is "a middle ground between 'heightened fact pleading,' which is expressly rejected, and allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the [Supreme] Court stated 'will not do.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir.

44

2008) (citations omitted) (quoting *Twombly*, 550 U.S. at 555, 570).  The focus of our inquiry is the "scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  This inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) ("The nature and specificity of the allegations required to state a plausible claim will vary based on context.").

Plaintiffs dispute the district court's dismissal of their strict-liability, negligence-per se, and negligence claims.[16]  Under Oklahoma law, all three of these claims require a specific allegation that the actions taken by the defendants caused an injury.  *See, e.g., Howard v. Zimmer*, 299 P.3d 463, 474 (Okla. 2013) ("[T]o prevail on a claim for negligence per se, the [plaintiff] must not only demonstrate violation of the regulation but also that the violation caused his injury along with the extent to which the injury may support an award of

---

[16]    The appellants do not argue that the district court erred in dismissing their trespass, nuisance, and unjust-enrichment claims; any challenge to the dismissal of these claims is therefore deemed waived.  *See, e.g.*, *Elliott Indus. Ltd. P'ship*, 407 F.3d at 1116 n.21 ("Failure to raise an issue in an opening appellate brief waives the issue.").

45

damages."); *Copeland v. Lodge Enters., Inc.*, 4 P.3d 695, 699–700 (Okla. 2000) (Negligence requires "an injury to plaintiff proximately caused by the defendant's breach of [a] duty" owed to plaintiff); *City of Mangum v. Brownlee*, 75 P.2d 174, 175–176 (Okla. 1938) (noting, in a case establishing strict liability for the possession of wild animals, that "[t]he plaintiff was invited on the premises[] and . . . was injured . . . . These facts establish liability."). We have also stated that "a plaintiff in a toxic tort case must prove that he or she was exposed to *and injured by* a harmful substance manufactured by the defendant." *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (emphasis added); *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005) (stating that in toxic tort litigation, "plaintiffs must show both general and specific causation. General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual's injury." (citations omitted)).

Plaintiffs' amended complaint (generously read) lists two conceivable categories of injury. The first are expressions of "reasonabl[e] concern[]." Aplt. App. at 798. The amended complaint states that Plaintiffs are "reasonably concerned" about several risks: "breathing air contaminated with particulates from . . . CCW/Fly Ash and PFW," "the threat to their health caused by needing to shutter themselves indoors," "CCW/Fly Ash and PFW contamination of . . . water sources . . . impair[ing] the safety of the creeks for swimming and for

46

consuming fish caught from the creeks, or game shot nearby," "the safety of handling and using crops harvested along the banks of these water sources," and that "CCW/Fly Ash and PFW renders their soil and vegetables unsafe or otherwise impairs its quality." *Id.* at 798–99. The second category of alleged injury is statements of present harm. The plaintiffs allege that they "suffer physical ailments consistent with disclosures and warnings set forth on MSDS [i.e., Material Safety Data Sheets]. These include, but are not limited to, respiratory conditions, such as asthma and bronchial and nasal infections, and skin and eye irritations." *Id.* at 799. Neither of these categories of alleged injury adequately support, as a matter of law, claims for relief.

Alleging reasonable concern about an injury occurring in the future is not sufficient to allege an actual injury in fact. Oklahoma law is clear that a cause of action does not accrue until an injury in fact occurs. *See Consol. Grain & Barge Co. v. Structural Sys., Inc.*, 212 P.3d 1168, 1171 & n.8 (Okla. 2009) (stating that an action accrues when a litigant can first successfully maintain the action, which requires demonstrating all elements of the claim, including an injury proximately resulting from the violation of an existing duty). Indeed, "[i]t is well established that a plaintiff in a toxic tort case must prove that he or she was exposed to and injured by a harmful substance manufactured by the defendant." *Mitchell*, 165 F.3d at 781. We have held that in such cases, "risk of potential future harm is not cognizable" to demonstrate injury. *Adams-Arapahoe Sch. Dist. No. 28-J v. GAF*

*Corp.*, 959 F.2d 868, 872–73 (10th Cir. 1992) (holding that the plaintiffs had not adequately alleged injury under Colorado tort law by pleading the "mere risk of harm" from the use of floor tiles containing asbestos); *see Consol. Grain & Barge Co.*, 212 P.3d at 1171 n.8 ("[I]n order to maintain a negligence action to a successful conclusion, the litigant must allege injury or damages that are certain and not speculative."); *see also City of Wichita v. U.S. Gypsum Co.*, 72 F.3d 1491, 1498 (10th Cir. 1996) (stating, in applying Kansas law, "Actual physical injury is an essential element of any negligence claim and tort liability may not be premised on mere risk of potential future harm not yet suffered."). However, Plaintiffs' allegations of reasonable concern merely allege that Plaintiffs are concerned about the risk of future injury; that is not enough. The alleged future injuries occupying Plaintiffs' present concerns might form the basis for an action if they were to become manifest; but, until they do, there is no basis for relief. Thus, these averments of concern about possible future injuries are not sufficient to plausibly satisfy the injury component of the claims at issue.

And, second, as to the allegations of present physical harm, they likewise do not satisfy the *Twombly/Iqbal* plausibility standard. The general statement that plaintiffs suffer ailments consistent with exposure to CCW is nothing more than a "formulaic recitation"; as such, we do not give it much credence. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) (stating that conclusory allegations in a complaint are "not entitled to the assumption of truth"). While

48

Plaintiffs list conditions including "asthma and bronchial and nasal infections, and skin and eye irritations," Aplt. App. at 799, its list is just "a litany of diverse and vague alleged [harms] . . . with zero details or concrete examples," *see Burnett*, 706 F.3d at 1240 (concluding that an allegation that defendants made false representations by "emails, faxes, correspondence, telephone calls, and/or meetings, and the like" to be insufficient). Indeed, the generality of the alleged harms significantly undercuts the desired plausibilty of Plaintiffs' claims because those harms might "encompass a wide swath of" innocent sources. *See Robbins*, 519 F.3d at 1247. There are no specific allegations of individual Plaintiffs contracting the alleged ailments after coming into contact with CCW or PFW, from which a court might "draw the reasonable inference that the defendant[s] [are] liable." *Iqbal*, 556 U.S. at 678; *see Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient.").

Despite being twice warned by the court of the need to identify "plaintiffs [who] individually sustained personal injuries or property damage as [a] result of the allegedly contaminated water," Aplt. App. at 1511, Plaintiffs did not point to a single individual class member who had suffered these effects or point to any specific patient whose symptoms might plausibly be linked to the actions of Defendants. Nor did Plaintiffs allege that these health effects exceed the

49

statistically typical natural occurrence of these symptoms. Their summary statement of health effects is nothing more than a rote recitation of general harms derived from MSDS, untethered to the experience of any particular person exposed to CCW or PFW. Accordingly, we cannot afford these averments any weight. *See Khalik*, 671 F.3d at 1193.

While we have recognized that the "nature and specificity of the allegations required to state a plausible claim will vary based on context," *Kan. Penn Gaming*, 656 F.3d at 1215, individual instances of concrete injuries related to exposure to CCW and PFW are the kinds of "details the Plaintiff[s] should know and could properly plead," *Khalik*, 671 F.3d at 1194. Plaintiffs' pleading failure in this regard defeats all of their claims.

### III

The district court properly denied both motions to remand and dismissed the amended complaint against Defendants. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

50