FILED
United States Court of Appeals
Tenth Circuit

July 13, 2022

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BRIAN LAX; TRACY BURON-
HAHNLEIN; WERNER HAHNLEIN;
JEREMY HADER,

     Plaintiffs - Appellees,

v.

APP OF NEW MEXICO ED, PLLC, f/k/a
AlignMD of New Mexico, PLLC,

     Defendant - Appellant,

and

LOVELACE HEALTH SYSTEM, LLC,

     Defendant.

_____

BRIAN LAX; TRACY BURON-
HAHNLEIN; WERNER HAHNLEIN;
JEREMY HADER, on their own behalf
and on behalf of others similarly situated,

     Plaintiffs - Appellees,

v.

LOVELACE HEALTH SYSTEM, LLC,

     Defendant - Appellant,

and

APP OF NEW MEXICO ED, PLLC, f/k/a
AlignMD of New Mexico, PLLC,

No. 22-2057
(D.C. No. 1:20-CV-00264-SCY-JFR)
(D. N.M.)

No. 22-2058
(D.C. No. 1:20-CV-00264-SCY-JFR)
(D. N.M.)

Defendant.

---

**ORDER AND JUDGMENT***

---

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

---

In these consolidated appeals, APP of New Mexico ED, PLLC (APP) and

Lovelace Health System, LLC (Lovelace), appeal from the district court's order

remanding this putative class-action suit to New Mexico state court.  Exercising

jurisdiction under 28 U.S.C. § 1453(c)(1), we affirm.

I.

Plaintiffs in this suit are former patients who sought treatment at Lovelace

facilities located in the state of New Mexico.  They allege that APP, a company that

provides emergency room physician and nurse practitioner staffing for Lovelace

facilities, overbilled them at out-of-network rates even though plaintiffs were

in-network with Lovelace.  Plaintiffs filed this class action against APP and Lovelace

in New Mexico state court in February 2020.  Their complaint included claims for

violations of the New Mexico Unfair Practices Act, conversion, willful breach of

---

*After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

contract, unjust enrichment, and civil conspiracy.  They sought certification of a proposed class including "all New Mexico residents who, beginning four years prior to the filing date of this lawsuit, were billed by APP for amounts greater than the in-network amount permitted by their insurance provider for medical services provided at Lovelace facilities."  J.A., Vol. I at 40.

APP, which is a limited liability company with its principal place of business in Tennessee, removed the action to federal court based on the Class Action Fairness Act (CAFA).  CAFA grants district courts jurisdiction over class actions involving at least 100 proposed class members, more than $5,000,000 in controversy, and the presence of a plaintiff class member who is a citizen of a state different from any defendant.  *See* 28 U.S.C. § 1332(d)(2)(A), (d)(5)(B).  Lovelace consented to the removal.

Plaintiffs later filed a motion to remand the case to state court.  They asserted the case should be remanded because defendants had failed to establish that more than $5,000,000 was in controversy.  They further argued that even assuming the amount-in-controversy requirements were met, CAFA's "local controversy exception" mandated that the action remain in state court.  The local controversy exception requires a district court to decline jurisdiction if (1) "greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed"; (2) the action seeks "significant relief" from at least one defendant "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class," and "who is a citizen of the

3

State in which the action was originally filed"; (3) the plaintiffs' principal injuries "were incurred in the State in which the action was originally filed"; and (4) "during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons." *Id.* § 1332(d)(4)(A).

The district court found that the $5,000,000 jurisdictional threshold was met. That determination is not challenged in this appeal. It also initially found that the plaintiffs had failed to show that the local controversy exception applied because they failed to establish that more than two-thirds of the proposed class members, whom the complaint defined as New Mexico residents, were also New Mexico citizens. The district court then took plaintiffs' motion to remand under advisement and provided them with the opportunity to conduct limited discovery on the question of class citizenship.

Plaintiffs filed an amended motion to remand. In connection with the amended motion, they produced an expert report from Professor James H. Degnan, an Associate Professor in the Department of Mathematics and Statistics at the University of New Mexico. Based on a statistical sampling Dr. Degnan conducted, plaintiffs argued they had proved that more than two-thirds of the class members were citizens of New Mexico.

In his expert report, Dr. Degnan explained that APP had provided plaintiffs with information concerning all people who received services from APP during the four-year period covered by the lawsuit who were in-network with Lovelace and

4

out-of-network with APP.  From that list, plaintiffs' counsel removed transactions in which a customer did not have a New Mexico address, was not billed by APP, or received the first bill from APP after APP had already received payment.  They also removed duplicate entries.  This left 29,351 class member records.  Professor Degnan then created a random sample of 100 class members from the revised list and provided the sample to plaintiffs' counsel.

Law firm employees contacted the class members on the list by telephone and surveyed them using a script format agreed upon by the parties.  The telephone survey showed that, of the 100 sample class members, 52 affirmed their New Mexico citizenship, one stated he was not a citizen, and 47 either would not respond or could not be reached.  Plaintiffs then retained a service that performed a "skip trace" to determine if additional information could be obtained about the 47 non-respondents.  This skip tracing uncovered information concerning 83 of the 100 class members:[1] their current residential address, property ownership on February 11, 2020 (the date the complaint was filed), and vehicle registration on February 11, 2020.[2]

---

[1] It is unclear what proportion of these 83 class members were respondents vs. non-respondents to the telephone survey.  The Director of Operations at the skip tracing company filed a declaration stating that 20 of the non-respondents yielded New Mexico "data in 0 or 1 of the 3 categories."  *See* J.A., Vol. I at 231.  *Id.*  Data in "zero" categories appears to mean no data was found for a particular non-respondent, either in New Mexico or elsewhere.  This would indicate that a particular non-respondent was one of the 17 out of 100 class members for whom skip tracing yielded no data.

[2] Plaintiffs initially sought vehicle registration and driver's license information from the New Mexico Taxation and Revenue Department (NMTRD), but the response they received from NMTRD was redacted, making it impossible to match

The skip tracing confirmed the data from the survey respondents. None of the class members who had affirmed their New Mexico citizenship were shown to be identified with non-New Mexico data in any of the three categories.

The skip tracing also yielded data concerning the 47 non-respondents. Of those non-respondents, 27 were identified with New Mexico data in at least two of the three categories and had no non-New Mexico data in any category. The other 20 non-respondents either were identified with New Mexico data in only zero or one of the three categories or were identified with non-New Mexico data in one or more of the categories. Dr. Degnan then added the 52 class members who had affirmed their New Mexico citizenship to the 27 non-respondents who met at least two of the three categories to conclude that "79 of the 100 class members in the random sample were identified as citizens of New Mexico as of the date of filing the complaint." J.A., Vol. I at 210.[3] He concluded with "[a] 95% confidence interval for this data . . . that the true proportion of New Mexico citizens from the population of 29,351 individuals sampled is larger than 2/3." *Id.* In other words, the survey results combined with the

---

the documents to the class members. *See* J.A., Vol. II at 436. Plaintiffs also sought voter registration information from the New Mexico Secretary of State but received no response. *See id.*

[3] Although Dr. Degnan's report merely states that the skip trace revealed data in two of the three categories—which could be understood to mean *any* two of plaintiffs' three criteria—the parties later clarified that "the 2 of 3 test [for citizenship] meant a finding of continuous residence plus at least one of the two other categories (vehicle registration or property ownership)." J.A., Vol. II at 450 n.6 (internal quotation marks omitted).

skip-tracing results showed that the class met the two-thirds requirement for the local controversy exception.[4]

Defendants produced their own expert report that criticized the scientific reliability of Dr. Degnan's report. They again opposed plaintiffs' motion to remand, arguing plaintiffs had failed to meet the local controversy requirement because they had failed to show that (1) two-thirds of the proposed class were citizens of New Mexico, and (2) the New Mexico defendant named in the complaint, Lovelace, was a "significant defendant" whose conduct formed a significant basis for plaintiffs' claims and from whom plaintiffs sought significant relief. The district court determined that plaintiffs met their burden to show that the local controversy requirements were met. It therefore granted their motion to remand.

APP and Lovelace filed petitions for permission to appeal, *see* 28 U.S.C. § 1453(c)(1), which we granted.

## II.

## A.

"CAFA was enacted to respond to perceived abusive practices by plaintiffs and their attorneys in litigating major class actions with interstate features in state courts." *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1262 (10th Cir. 2014) (internal quotation marks omitted). CAFA permits a federal court to assume original

---

[4] Dr. Degnan also produced a supplemental report, *see* J.A., Vol. I at 232-34, but the district court struck it and did not consider it in connection with its decision, *see id.*, Vol. II at 443 n.3.

jurisdiction if certain requirements are met. *See id.* Congress included several exceptions to CAFA's removal procedure. The party seeking a remand to the state court under one of these exceptions bears the burden of showing by a preponderance of the evidence that the exercise of federal court jurisdiction is improper. *See id.*; *Mondragon v. Cap. One Auto Fin.*, 736 F.3d 880, 884 (9th Cir. 2013) (stating preponderance standard).

The local controversy exception "is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes." *Woods*, 771 F.3d at 1262 (internal quotation marks omitted). "Rather than divesting a court of jurisdiction, the local controversy exception operates as an abstention doctrine" under which the federal court abstains from hearing the case in favor of the state's demonstrated interest in the dispute. *Dutcher v. Matheson*, 840 F.3d 1183, 1190 (10th Cir. 2016) (internal quotation marks omitted). It "is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole and all doubts are resolved in favor of exercising jurisdiction over the case." *Id.* (brackets and internal quotation marks omitted). "[R]emand is mandatory if the plaintiffs can show that they meet the requirements of the local controversy exception." *Id.*

## B.

We review de novo the district court's interpretation of CAFA. *See Woods*, 771 F.3d at 1262. We review the district court's factual findings for clear error.

8

*Mondragon*, 736 F.3d at 886. "Under that standard, we may reverse only if the district court's finding lacks factual support in the record or if, after reviewing all the evidence, we have a definite and firm conviction that the district court erred." *Middleton v. Stephenson*, 749 F.3d 1197, 1201 (10th Cir. 2014). The district court's findings concerning citizenship are factual findings subject to our clearly erroneous review. *See id.* (diversity jurisdiction case).

### III.

Defendants challenge the district court's finding that plaintiffs showed more than two-thirds of class members are New Mexico citizens. *See* 28 U.S.C. § 1332(d)(4)(A)(i)(I). "[A] person is a citizen of a state if the person is domiciled in that state." *Middleton*, 749 F.3d at 1200. "[A] person acquires domicile in a state when the person resides there and intends to remain there indefinitely," a status that courts typically discern from the "totality of the circumstances." *Id.* at 1200-01.

We have described the citizenship inquiry as "an all-things-considered approach" in which "any number of factors might shed light on the subject in any given case." *Id.* at 1201. Relevant factors include

> the party's current residence; voter registration and voting practices; situs of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license and automobile registration; payment of taxes; as well as several other aspects of human life and activity.

*Id.* (internal quotation marks omitted). Although a person's "place of residence is *prima facie* the domicile," *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520

(10th Cir. 1994), something more than residence in a state is required to show the intent to remain in the state, *see Whitelock v. Leatherman*, 460 F.2d 507, 514 (10th Cir. 1972) ("[A]llegations of mere 'residence' may not be equated with 'citizenship.'").

Defendants contend the district court's citizenship finding was clearly erroneous because plaintiffs' method of proof, which the district court accepted, was unreliable or inadequate. Because it is impracticable to obtain information concerning citizenship of all the members of a large class, affidavits or survey responses targeting a representative sample of class members is a legitimate means of satisfying a plaintiff's burden under a CAFA exception. *See, e.g.*, *In re Sprint Nextel Corp.*, 593 F.3d 669, 675-76 (7th Cir. 2010) (stating that "affidavits or survey responses in which putative class members reveal whether they intend to remain in Kansas indefinitely" might be sufficient to establish citizenship of those survey respondents under CAFA's home-state exception). Defendants argue, however, that plaintiffs' approach in this case, which involved a survey to which nearly half those surveyed failed to respond, coupled with skip tracing that obtained information on only a few citizenship-related factors concerning the non-respondents, did not produce reliable indicia of citizenship. They claim plaintiffs' method was flawed because it allowed them to count a significant number of non-responding class members—for whom there was only skip-trace evidence of current New Mexico residency plus *either* evidence of New Mexico property ownership *or* vehicle registration—as New Mexico citizens. They argue that the district court's reliance

10

on only these few factors rather than the totality of potentially relevant considerations, as discussed in *Middleton*, was erroneous.[5]

*Middleton* was a non-class-action case where we were concerned with the citizenship of a single defendant who had raised counterclaims and third-party claims in reliance on diversity jurisdiction. 749 F.3d at 1198-1200. The determination of domicile used in non-class-action cases risks becoming unnecessarily arduous when transported to the context of CAFA exceptions. *See Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 816 (5th Cir. 2007). A better approach when determining CAFA exceptions is to use an evidentiary standard "based on practicality and reasonableness." *Id.* Under this approach, defendants fail to show that the plaintiffs' method was unreasonable.

---

[5] Defendants suggest that plaintiffs cherry-picked the available data. They complain, for example, that plaintiffs gathered employment data but chose not to use it in the citizenship inquiry. But the district court explained the plaintiffs' reasons for not relying on the employment data:

> Plaintiffs chose not to use this data because they could not draw inferences from it, one way or another, due to various problems such as old information and that some data lacked corresponding addresses or provided an address of a corporate office instead of a local office. In other words, the data could not be used to reliably determine whether a person was employed in New Mexico.

J.A., Vol. II at 460. We discern no error in this determination. Also, as we have noted, *see supra* n.2, plaintiffs sought data for the sample on vehicle registration and driver's licenses but were unable to obtain usable information concerning these factors. These facts do not suggest that plaintiffs relied on only the available data that favored their position.

Defendants contend that residency plus property ownership in a state does not necessarily equal citizenship. They cite the examples of military members, students, or green card holders, who may reside in New Mexico and own property there without being New Mexico citizens. It is true that residency in a state does not equate to citizenship, *see Whitelock*, 460 F.2d at 514, and that property ownership in a state, without more, does not establish citizenship in that state, *see, e.g.*, *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1165-66 (11th Cir. 2006). Here, however, two additional factors enhanced the reliability of the finding that those non-respondents were in fact New Mexico citizens. First, the skip-tracing uncovered no data that they resided, owned property, or had registered vehicles in any other state. Second, they were residents of New Mexico both when they received the medical service and years later, when the skip tracing was performed. Both these factors support the district court's conclusion that these class members were not only residents of New Mexico but also were citizens who intended to remain within that state.

These additional facts also rebut two other arguments the defendants make, that (1) even if plaintiffs established New Mexico citizenship by a preponderance of the evidence for each of the 27 non-responding class members who met the "residency plus one" test, and assuming that each of these class members therefore has "a 51% likelihood of citizenship, then it is highly unlikely that every single one of these 27 class members would be a citizen"; and that (2) random sampling of a class should only be used to determine citizenship when "the surveyed members of the sample confirm their citizenship." Aplt. Opening Br. at 38 (emphasis omitted).

12

First, we see no reason to conclude that the "residency plus one" method, when combined with other reasonable inferences to be drawn from the skip-tracing data, yielded only a 51 percent likelihood that each non-responding class member was a citizen. Second, skip tracing, when properly conducted, is a legitimate means of determining citizenship, particularly when a telephone survey yields too few results to provide an adequate analysis of the proposed class. "What is in another man's mind must be determined by what he does as well as by what he says." *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1157 (11th Cir. 2021) (internal quotation marks omitted). Skip tracing provides objective evidence of a party's intent to be domiciled in a particular state, and in the citizenship context. *See Preston*, 485 F.3d at 817 (stating the district court has broad discretion to determine what evidence to use in making a jurisdictional determination).

It is true that in determining citizenship, a court may not rely on guesswork, even "[s]ensible guesswork." *Sprint Nextel*, 593 F.3d at 674 (stating that although the court was "inclined to think that at least two-thirds of those who have Kansas cell phone numbers and use Kansas mailing addresses for their cell phone bills are probably Kansas citizens," such a common-sense conclusion based on "[s]ensible guesswork" was insufficient to determine citizenship because "a court may not draw conclusions about the citizenship of class members based on things like their phone numbers and mailing addresses"). But the district court's determination here was based on reasonable inferences drawn from the available data and did not represent

13

mere guesswork. We cannot conclude that its citizenship determination was clearly erroneous.[6]

Finally, we note that defendants cite two unpublished cases from this court that discuss citizenship in the CAFA context. Each is distinguished on its facts and is not inconsistent with our result.

In *Nichols v. Chesapeake Operating, LLC*, 718 F. App'x 736 (10th Cir. 2018), the district court denied the plaintiff's motion to remand his putative class-action case to state court under the "home state" exception, which requires that two-thirds or more of the class members must be citizens of the state where the action was filed. *See id.* at 738. His complaint described a class of "Oklahoma Residents" who had received royalty checks from the defendant. *Id.* (internal quotation marks omitted). To establish citizenship of class members for CAFA exception purposes, the plaintiff used a statistician, who (as in this case) randomly selected 100 royalty owners out of the thousands of potential class members. *See id.* After successfully surveying 54 of those 100 sample members, by asking them "whether they considered themselves to be Oklahoma citizens and whether they planned to move from Oklahoma in the near future," and, in the case of businesses, "whether they were organized or

---

[6] Defendants suggest that plaintiffs were required not only to prove that two-thirds of the members of the representative sample were New Mexico citizens, but also to provide prove that they were United States citizens. *See* Aplt. Opening Br. at 33 n.5. Defendants fail to show they made this argument in district court; we therefore decline to consider it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127-28 (10th Cir. 2011).

headquartered in Oklahoma," plaintiff's counsel "determined that 95% of the sample's royalty owners were Oklahoma citizens because the data shows indicia of Oklahoma citizenship with no conflicting data of citizenship elsewhere." *Id.* at 739 (internal quotation marks omitted).[7]

The district court rejected counsel's approach, finding significant flaws in the evidence and concluding, among other things, that "counsel had an insufficient basis for determining that some members of the random sample were Oklahoma citizens." *Id.* (internal quotation marks omitted). "For instance, the skip-trace reports indicated that only 35 of the sample's class members had Oklahoma driver's licenses and that 37 members had non-Oklahoma addresses." *Id.* n.2.

In upholding the district court's result, we emphasized the "flawed" nature of the sample and counsel's failure to "dispute these problems or otherwise explain how [the expert's] evidentiary extrapolation remains statistically viable." *Id.* at 742. The result in *Nichols* is consistent with this case, given that the survey/skip-trace in *Nichols* was significantly less reliable than those here.

In *Reece v. AES Corp.*, 638 F. App'x 755 (10th Cir. 2016), the district court denied the plaintiffs' motions to remand their putative class action to state court under CAFA's "local controversy," "home state," and "interests of justice" exceptions, and ultimately dismissed their complaint. *See id.* at 756, 759. The class was defined as "all

---

[7] Although *Nichols* mentions a "skip-trace investigation," *see* 718 F. App'x at 739, it is unclear from the decision to what extent the survey results were supplemented by skip tracing, or for how many of the 46 unsuccessfully surveyed sample class members skip trace data was obtained.

citizens and/or residents and/or property owners of the State of Oklahoma" who were in defined proximity to certain pollution-creating operations maintained by the defendants. *Id.* at 759.

In their renewed motion for remand, plaintiffs relied solely on the "local controversy" exception. *See id.* at 760 & n.8. They provided an affidavit from an expert who had analyzed property records within the class area and had concluded that at least two-thirds of the proposed class members were Oklahoma *residents*. *See id.* at 760-61. Plaintiffs did not include the records that underlay the expert's analysis. *See id.* at 761. The district court denied the renewed motion.

On appeal, the *Reece* court addressed the legal difference between residence and citizenship. *See id.* at 769. It concluded that where a class is defined as "residents" rather than "citizens" (as in our case), the plaintiffs seeking remand must "marshal and present some persuasive substantive evidence (extrinsic to the amended petition) to establish the [state] citizenship of the class members." *Id.* The *Reece* plaintiffs had failed to meet this standard because they had failed to "validate the conclusions contained in the summary exhibits by, for example, presenting to the court the records upon which the exhibits were ostensibly based or offering sworn testimony regarding the analysis underlying the conclusions." *Id.* at 770. Given that the complaint included plaintiffs from a twenty-year period that might not have currently been residents or citizens of Oklahoma, and that the plaintiffs' evidence dealt with residence rather than citizenship, the materials submitted with the first motion for remand were insufficient. *Id.* at 771.

The expert's affidavit submitted with the renewed motion failed to cure the fundamental defects of the first motion, because it was "framed in terms of residency, not citizenship." *Id.* at 774. In this case, by contrast, the extrinsic proof offered by the plaintiffs is framed in terms of citizenship, not mere residency. There is sufficient additional evidence on which the district court could rely in determining citizenship.

IV.

Defendants also challenge the district court's determination that Lovelace is a "significant" local defendant—that is, one "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class" and from whom plaintiffs seek "significant relief." 28 U.S.C. § 1332(d)(4)(A)(i)(II).[8] "CAFA itself does not describe the type or character of conduct that would form a 'significant basis' of plaintiffs' claims or define the term 'significant relief.'" *Woods*, 771 F.3d at 1265. But to further CAFA's statutory purposes, "we interpret the significant local defendant requirement strictly so that plaintiffs and their attorneys may not defeat CAFA jurisdiction by routinely naming at least one state citizen as a defendant, irrespective of whether that defendant is actually a primary focus of the litigation." *Id.*

---

[8] Defendants do not challenge Lovelace's New Mexico citizenship, so no issue concerning that factor is before us.

In *Woods*, we distilled the following guidelines from CAFA's legislative history for determining whether a defendant named in the complaint meets the statute's significant-local-defendant requirements:

> [F]or the local controversy exception to apply there must be at least one real defendant . . . whose alleged conduct is central to the class's claims and from whom the class seeks significant relief. . . . [T]he local defendant must be a primary focus of the plaintiffs' claims—not just a peripheral defendant.  The defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class.

*Id.* at 1266 (citation and internal quotation marks omitted).

The district court determined that plaintiffs' complaint adequately alleged that Lovelace's conduct formed a significant basis for the claims the class asserted.  In addition to reviewing the complaint, it accepted extrinsic evidence from the defendants but found this evidence unconvincing.  The district court noted:

> [A]lthough Plaintiffs allege that APP was the party responsible for the actual overbilling, they also allege Lovelace was a significant player in an alleged overbilling scheme.  They allege that Lovelace interacted with all of the proposed class members by advertising itself as in-network, failing to disclose its relationship with APP and APP's billing practices, treating the Plaintiffs, and then benefitting from APP's overbilling.  Indeed, they allege that both Lovelace and APP are agents for the other and ratified each other's misconduct.

J.A., Vol. II at 464.

The district court further determined that plaintiffs sought significant relief from Lovelace.  It found that "Plaintiffs' complaint makes clear that Lovelace is a primary target of litigation and a defendant from whom the entire class of plaintiffs seeks relief"; that the plaintiffs alleged that defendants were "jointly and severally

liable for all damages and that each are directly liable; are liable for aiding, abetting, participating in, and ratifying the other parties' conduct; are vicariously liable for each other's misconduct; and are liable as members of a joint enterprise"; and that plaintiffs' five claims for relief were each asserted against both Lovelace and APP for their joint overbilling scheme. *Id.* at 467-68 (internal quotation marks omitted).

A.

To determine whether the "significant basis" element is met, we examine whether the local defendant's conduct "forms a significant basis for the claims asserted by the class." *Woods*, 771 F.3d at 1266. Defendants argue that "[o]nly APP's alleged conduct," not Lovelace's, "forms a significant basis of Plaintiffs' claims." Aplt. Opening Br. at 17. But we agree with the district court's conclusion that "Lovelace is a real target of the litigation," based on Lovelace's conduct identified in the complaint. J.A., Vol. II at 465. Although APP allegedly committed the overbilling, APP could not have done so "had Lovelace not advertised itself as in-network, treated the patients, contracted with APP, and failed to disclose to patients its relationship with APP." *Id.* at 466.

The complaint thoroughly describes Lovelace's role in the alleged scheme, which includes alleged misrepresentations and material omissions made by Lovelace. It alleges that "Lovelace holds out to the public that it is an in-network provider for numerous insurance plans" but that Lovelace does not disclose numerous features of its relationship with APP to patients, including the fact that "they may end up paying more than the in-network rate for services provided by APP employees." J.A., Vol. I

19

at 33-34. The complaint further alleges that although "ostensibly, Lovelace takes the position that such overbilling should not be taking place," in reality, "Lovelace benefits from APP's overbilling" and "Lovelace and APP are part of a joint enterprise" and "acted as one another's agents in the conduct described." *Id.* at 34. In addition, each of the claims for relief asserts that the potential plaintiffs are entitled to recover from Lovelace, and that the defendants are liable for each other's alleged misconduct, and the prayer for relief asks that defendants be found jointly and severally liable for all damages. We agree with the district court that the language in the complaint satisfies the significant basis element.

Defendants cite extrinsic evidence that they claim contradicts the complaint and undermines plaintiffs' claims. Assuming this evidence may be considered in determining whether Lovelace is a significant local defendant, the extrinsic evidence fails to defeat plaintiffs' showing concerning that element.

First, defendants point to the "Consent to Treatment" forms that Lovelace provides to patients. *See* Aplt. Opening Br. at 25-26. These forms require patients to acknowledge (1) that Lovelace has not represented or taken actions to induce the patient to believe that the physicians, residents, medical students, and nurses providing treatment are Lovelace employees, and (2) that the patient will receive a separate bill from the provider. But this language does not notify patients of an important fact that forms the gist of plaintiffs' claims: that patients may end up paying more than the in-network rate for services provided by APP employees.

20

Second, defendants cite testimony from APP's Rule 30(b)(6) representative which indicates that Lovelace did not participate in APP's billing procedures. But the mere fact that APP sent the bills does not show that Lovelace's conduct, including alleged omissions and misrepresentations, fails to form a significant basis for plaintiffs' claims. We therefore conclude that neither item of extrinsic evidence undermines the district court's conclusion that Lovelace is a significant local defendant.

B.

Defendants argued in district court that plaintiffs did not seek significant relief from Lovelace because their complaint did not plausibly state a claim for relief against Lovelace. In evaluating this assertion, the district court stated it was not considering the merits of the claims, only whether they sought significant relief. The district court then rejected defendants' argument in part because the claims "d[id] not appear frivolous on their face." J.A., Vol. II at 468. Defendants argue the district court should have analyzed the claims under the plausibility standard described in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007), not a frivolousness standard. Defendants then supply an analysis of each of plaintiffs' claims, asserting that each fails to state a claim against Lovelace under the *Iqbal/Twombly* analysis.

21

Assuming the *Iqbal/Twombly* standard plays a role in assessing whether plaintiffs' claims seek significant relief from Lovelace,[9] we discern no reversible error here.  Under that standard, plaintiffs' allegations need only be sufficient to raise their "right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Defendants have not shown that plaintiffs' complaint fails the plausibility standard for purposes of our threshold jurisdictional analysis.

Defendants assert that plaintiffs' first claim, under the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to 26, fails because it "does not allege that Lovelace was aware of APP's alleged misconduct, and therefore could not have intentionally misled patients"; because it does not allege that Lovelace made some other representation that would become misleading in the absence of a disclosure;

---

[9] Whether and how the standard applies to this inquiry seems less than clear. *See Allen v. Boeing Co.*, 821 F.3d 1111, 1119 n.8 (9th Cir. 2016) (stating that "for purposes of assessing the applicability of [CAFA's] local controversy exception, we can ignore a claim against [the local defendant] only if that claim is immaterial, insubstantial, or frivolous on its face," but alternatively applying the *Iqbal/Twombly* standard to the relevant claim (internal quotation marks omitted)).  It has also been suggested that rather than applying the federally based *Iqbal/Twombly* standard to such inquiries, a federal court should view the pleadings as a state court (in this case, New Mexico) would view them. *See Arbuckle Mtn. Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 343-44 (5th Cir. 2016) (Elrod, J., dissenting).  We need not definitively resolve this issue, however, because New Mexico's "notice pleading" rules appear to be at least as liberal to a plaintiff's pleadings as the *Iqbal/Twombly* standard. *See Madrid v. Vill. of Chama*, 283 P.3d 871, 875-76 (N.M. Ct. App. 2012).

22

and because it fails to show that any alleged omission was material. Aplt. Opening Br. at 19-20. But the complaint alleges that Lovelace "holds out to the public that it is an in-network provider for numerous insurance plans" but "does not state to its patients that they may end up paying more than the in-network rate for services provided by APP employees." J.A., Vol. I at 33-34. The complaint states that "Lovelace takes the position that such overbilling should not be taking place," *id.* at 34, which could lead a court to reasonably infer that Lovelace is aware that "such overbilling" *is* taking place. The complaint also alleges sufficient facts to show materiality, given that plaintiffs chose to obtain care at Lovelace facilities because they were informed that Lovelace was an in-network provider under their insurance coverage, and their damages flowed from overbilling that exceeded the in-network rate. These factual allegations are sufficient to show that plaintiffs' Unfair Practices Act claim seeks significant relief from Lovelace.

Defendants assert that plaintiffs' conversion claim fails against Lovelace because any alleged overpayments were made to APP, not Lovelace. The complaint alleges, however, that Lovelace and APP operated as a "joint enterprise," "agreed to share their money, property, employees, and time in pursuit of their emergency room business," and "share the profits and losses of the business and they are subject to mutual control over the business." *Id.* Although a threadbare assertion of "joint and several liability" cannot make an otherwise insignificant defendant significant, *see Woods*, 771 F.3d at 1269, where the plaintiffs' damage claim rests on a claim of joint and several liability implicating the local defendant's own conduct, the significant

23

relief requirement may be satisfied, *see Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1244 (10th Cir. 2009). That standard is met here.

Defendants assert that plaintiffs' claim for breach of contract fails against Lovelace because their complaint fails to identify the terms of the contract with Lovelace that were breached or how Lovelace breached them. Although the facts underlying the contractual claim are not particularly well articulated, we cannot say that it fails the jurisdictional analysis. A court could reasonably infer from the complaint that the "contract" referred to involves the patient's agreement that Lovelace will provide medical services at its facilities, including providing medical personnel to perform those services, in consideration of payment by the patient or his or her insurance company. As part of this contractual understanding with patients, Lovelace represented that it was an in-network provider, but it breached the "covenant of good faith and fair dealing," *see* J.A., Vol. I at 43, by using medical personnel that it knew would overbill patients beyond in-network rates.

Defendants assert that plaintiffs' unjust enrichment claim fails against Lovelace because the complaint provides no factual basis to conclude that Lovelace retained any benefit from APP's overbilling. For the reasons discussed concerning the conversion claim, *supra*, the allegations that Lovelace benefitted are sufficient, if only barely so.

Finally, defendants assert that plaintiffs' civil conspiracy claim fails against Lovelace because (1) the complaint alleges that Lovelace did not believe APP should be overbilling patients because such overbilling was barred by Lovelace's contract

24

with APP, and (2) the complaint fails to state any specific acts Lovelace took in furtherance of the alleged conspiracy. Taken in context, the cited allegations assert that Lovelace does not disclose to patients that they may end up paying more than in-network rates for APP's employees' services, because "ostensibly, Lovelace takes the position that such overbilling should not be taking place," but that Lovelace nevertheless "benefits from APP's overbilling." *Id.* at 34. A reasonable inference from these provisions, taken as a whole, is that Lovelace has tacitly agreed to continue to represent itself as an in-network provider and to pursue its profitable arrangement with APP while turning a blind eye to APP's overbilling practices, which are facilitated by Lovelace's representations and contractual arrangements with patients and insurance companies. This conduct by Lovelace, including allegedly misleading omissions made to the public and to patients, facilitates the alleged conspiracy.

In sum, to the extent a merits-based inquiry is appropriate when deciding the remand issue, we cannot say at this stage that plaintiffs' complaint fails to seek significant relief from Lovelace. Finally, in considering Lovelace's significance as a defendant, we must compare its conduct with that of the other defendant, APP. *See Woods*, 771 F.3d at 1266. For the reasons we have identified, Lovelace qualifies as a significant local defendant under this comparative analysis. Contrary to defendant's contention, it does not appear that plaintiffs named Lovelace to defeat CAFA jurisdiction, or that Lovelace is not "actually a primary focus of the litigation." *Id.* at 1265.

V.

We affirm the district court's order of remand.

Entered for the Court


Nancy L. Moritz
Circuit Judge